**PHILADELPHIA CITIZENS IN ACTION by Roxanne Jones, Executive Director and Trustee Ad Litem, and Philadelphia Welfare Rights Organization by Louise Brookins, Executive Director and Trustee Ad Litem,**

**v.**

**Richard SCHWEIKER, Secretary, United States Department of Health and Human Services, and Helen O'Bannon, Secretary, Department of Public Welfare, Commonwealth of Pennsylvania, Helen O'Bannon, Appellant in No. 81–2915, Richard Schweiker, Appellant in No. 81–2916, Philadelphia Citizens in Action and Philadelphia Welfare Rights Organization, Appellants in No. 81–2942.**

Nos. 81–2915, 81–2916 and 81–2942.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1981.

Decided Jan. 15, 1982.

Rehearing and Rehearing In Banc Denied Feb. 10, 1982.

---

John O. J. Shellenberger, (argued), Deputy Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., LeRoy S. Zimmerman, Atty. Gen., Stanley I. Slipakoff, Chief of Litigation, Dept. of Public Welfare, Philadelphia, Pa., for Helen O'Bannon.

Douglas G. Dye (argued), Jonathan M. Stein, Richard Weishaupt, Community Legal Services, Inc., Philadelphia, Pa., for Philadelphia Citizens in Action and Philadelphia Welfare Rights Organization.

J. Paul McGrath, Asst. Atty. Gen., Peter F. Vaira, Jr., U. S. Atty., Leonard Schaitman, Michael Kimmel (argued), Susan Sleater, Attys., Dept. of Justice, Washington, D. C., for Richard Schweiker.

Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

President Reagan signed into law the Omnibus Budget Reconciliation Act (OBRA), Pub.L.No.97–35, 95 Stat. 357, on August 13, 1981. OBRA was the product of a major, highly publicized, and vigorously debated effort by Congress and the President to reverse the growth of federal spending by systematically reducing the level of expenditures in a wide range of federal programs. In one of its many provisions, OBRA mandated' major revisions in the Aid to Families with Dependent Children (AFDC) program, reducing or elimina-

ting federal funding for state-administered AFDC benefits to many persons who until then were eligible to receive those benefits. Congress set October 1, 1981, as the date on which the changes were to take effect.

The Department of Health and Human Services (HHS), which is charged with administering the AFDC program at the federal level, issued rules on September 21, 1981, to implement the revisions in AFDC policy. 46 Fed.Reg. 46750–73. The Secretary of HHS declared these rules to be "interim rules" for a 60-day period, during which time the Department would entertain comments on them. The Department proposed to issue final rules at the end of that period, on November 20, 1981. The Pennsylvania Department of Public Welfare (DPW) promulgated state regulations implementing the provisions of OBRA on November 7, 1981, to be effective November 9, 1981. 11 Pa.Bull. 3954–82 (Nov. 7, 1981).

Philadelphia Citizens in Action (PCIA) and the Philadelphia Welfare Rights Organization (PWRO), two associations comprising recipients of various types of welfare benefits, filed suit in the Eastern District of Pennsylvania on October 30, 1981, alleging that the federal rules had not been promulgated in conformity with the Administrative Procedure Act (APA), 5 U.S.C. § 553. The organizations sought injunctive and declaratory relief against HHS and DPW to prevent them from taking any action based on the federal AFDC rules or any conforming state regulations. After a hearing, the district court issued an order on November 20, 1981, invalidating the rules adopted by HHS and enjoining the Commonwealth of Pennsylvania from "reducing and/or terminating AFDC benefits in reliance on either the invalidated federal regulations or the Pennsylvania regulations published November 7, 1981...." The effect of this order was to forestall implementation of the statutorily-mandated changes in AFDC policy and to subject Pennsylvania to the risk that its payment of benefits at the existing higher level would not be reimbursed by the federal government. The state and federal agencies applied to this Court for a stay of the district court's order. We declined to grant that request at that time, and instead ordered an expedited hearing schedule. On December 2, 1981, we heard oral argument on the merits of the appeal and at the conclusion of the argument issued a stay of the district court's order. We now decide that the district court erred in declaring the federal rules invalid and in enjoining the Pennsylvania rules. Accordingly, we reverse the order of the district court.

## I.

Congress created the AFDC program in 1935, and established it in Title IV, Part A of the Social Security Act, 49 Stat. 627, codified at 42 U.S.C. §§ 601–676. The program is intended to promote the care of needy dependent children in their own homes or in those of relatives and to assist the parents or relatives with whom they live to attain self-sufficiency. See 42 U.S.C. § 601. Under the statutory program, benefits are paid and administered by those states that wish to participate in the program. A state that desires to participate must first obtain from HHS approval for its state plan, which must conform with the statutory requirements of Title IV and the HHS implementing rules. States that receive approval can obtain reimbursement from the federal government for more than half of the benefits paid and administrative expenses incurred under their plan. See 42 U.S.C. § 603.

The primary purpose of the OBRA amendments to the AFDC program is to reduce or eliminate welfare benefits for those considered by Congress to be less needy than those completely without resources—persons or households that have available other sources of income or resources with which to support themselves. The amendments are intended to accomplish this by a number of means: limits on the amount of a potential recipient's earned income to be disregarded in determining eligibility and grant size, Pub.L.No.97–35, § 2301; redefinition of a potential recipient's income and resources, § 2302; lower income limits on eligibility, § 2303; new

treatment of lump-sum payments and earned income advances, §§ 2304, 2305; and several other approaches, §§ 2306–2320.

Under the Social Security Act, HHS is required to promulgate rules and regulations to effectuate the AFDC programs and provide guidance to states so that they may comply with federal requirements. 42 U.S.C. § 639. Following enactment of OBRA, HHS was obliged to issue new rules to meet the new requirements of the OBRA amendments. Aware before the Act was set in final form that OBRA would contain amendments to the AFDC program, HHS began taking steps towards the eventual promulgation of new rules as early as May 1981, when a study group was created to formulate plans for drafting new rules. In order to give the public and interested groups as much opportunity to provide input, on July 2, 1981, and again on July 21, HHS sent out requests for comments and ideas as to possible regulations to individuals and organizations including PWRO, one of the appellees in this case. Representatives of HHS met with representatives of the American Public Welfare Association (APWA) on July 13 and August 3, 1981, and worked out a rough preliminary draft of proposed rules that was sent to the states through the APWA on August 13, 1981.

On the same date, OBRA was enacted into law. HHS at that point had 49 days

until October 1, 1981, the date by which the Act was to go into effect, to implement rules interpreting and applying the OBRA amendments, unless of course HHS was to postpone the effective date of the legislature beyond the date that Congress had mandated. Proposed rules were approved by the Secretary on September 3, 1981, twenty-one days after passage of the Act. Conferences were held by HHS for state administrators to discuss the statutory amendments and accompanying proposed rules on September 13 and 15, 1981. On September 21, 1981, the federal rules were published, 46 Fed.Reg. 46570, as interim rules for a 60-day notice and comment period. The rules took effect on October 1, 1981, the effective date of the statute. To a considerable extent the rules merely reiterated the statutory requirements and resolved relatively minor matters committed to the Department's discretion. During the 60-day period few comments on the rules were received by HHS. Indeed, no comment was received from the appellee organizations until November 19, 1981.

II.

A.

Appellees contend, and the district court held, that the Secretary's promulgation of its rules did not comply with the requirements of the APA, 5 U.S.C. § 553.[1] Section

---

1. We are somewhat concerned about the standing of the plaintiffs to seek relief on the basis of the asserted violation. The United States Supreme Court has in a number of cases set out fairly restrictive criteria for the standing of a public organization or association to challenge actions taken by the government. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 39–40, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976); Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

Those cases require that associations similar to the appellees in this situation show, among other things, that the challenged governmental activity has caused, or will cause, injury in fact either to themselves as associations or to their members. See, e.g., Hunt, 432 U.S. at 341–343, 97 S.Ct. at 2440–2441. Here the chief injury involved in the dispute—the termination or re-

duction of benefits to members who are AFDC recipients—is caused not by the challenged regulations but by the statute itself. The showing that there was some further injury to the appellee organizations and their members from the regulations alone, and in particular from the procedures by which the regulations were implemented, rests primarily on testimony that was somewhat vague as to the precise harms suffered and was unsupported, though also unrebutted. See Transcript of Hearings, Nov. 2, 1981, 10–11, 23–27 (Testimony of Victoria Freeman Roberts and Betty Van Dyke). Although we might not, as an initial trier of fact, have ourselves been persuaded by the testimony that an injury in fact had been demonstrated, we do not believe that the evidence on the record was insufficient as a matter of law to support a conclusion that the plaintiffs here do have standing to challenge the regulations in question.

553 sets out the procedures that an agency must follow in promulgating rules, requiring that notice of proposed rules be published in the Federal Register and that a period of time be provided in which the public can comment on the proposed rules and suggest changes to the promulgating agencies before the proposed rules become effective.[2] The asserted violation of this procedural requirement of the APA in the promulgation of the new federal AFDC regulations served as the basis for the district court's issuance of injunctive relief invalidating the federal rules as well as barring Pennsylvania from implementing its own regulations effecting the benefit cuts. The federal and state agencies do not contend that the procedures set out in section 553 for notice and comment were followed. Instead, they assert that because of a specific provision in the APA, HHS was not required in the circumstances present here to adhere to notice and comment procedures in this instance.

The APA provisions reflect a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations. The salutary effect of the APA has been widely noted. *See, e.g.,* 1 K. Davis, Administrative Law § 6:1 (2d ed. 1978). Yet surely one of the more attractive features of this procedural innovation is that lengthy administrative procedures are not required inexorably or inflexibly in situations where they are unnecessary or even counter-productive. Instead, Congress has seen fit to craft a number of exemptions from and qualifications to the rulemaking procedures required under section 553. And while one might question, as does Professor Davis, the appropriate contours for any exceptions to APA requirements, *see id.* at §§ 6:30–6:33, the explicit judgment of Congress as to when administrative agencies may dispense with formal rulemaking procedures must be respected.

Initially, we note that Congress did not require that APA procedures be employed for implementation of the regulations in question here; instead, these procedures are implicated in this case by a policy of HHS itself. Section 553(a)(2) exempts from the statutory mandate of section 553 matters "relating to ... loans, grants, benefits, or contracts." This exemption specifically applies to rules and regulations, such as those in question here, that concern benefits under the AFDC program. *See Rodriguez v. Swank*, 318 F.Supp. 289, 295–96 (N.D.Ill. 1970), *aff'd*, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971). However, the Secretary of HHS issued in 1971 a statement of policy that the Department would apply APA procedures in its rulemaking even when the exception for grants and benefits would make it clear that APA procedures were not required by statute. 36 Fed.Reg. 2532 (1971).[3]

## B.

The appellants assert that under both the APA and the Secretary's policy

---

**2.** Where applicable, § 553 requires the following notice and comment procedures:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

\* \* \* \* \*

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**3.** Because the issue was not raised in the district court, we do not reach the question whether the Department is bound by this statement of policy; instead, we assume arguendo that the Secretary's statement does commit the Department to compliance with the procedures set out in Section 553.

they are exempted from notice and comment requirements in the situation here because there exists good cause for avoiding these procedures. In this respect they rely on § 553(b)(B), which provides that notice and comment procedures are not required:

> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedures thereon are impracticable, unnecessary, or contrary to the public interest.

In the regulations published on September 21, 1981, the Secretary made a specific finding that congressional concern with reducing government spending immediately and the short time Congress provided for implementation of the amendments—from August 13 to October 1—made a full notice and comment procedure prior to implementation of the rules impracticable.[4] In reliance on this statement and the rationale it incorporates, the Secretary argued before the district court and reiterates here that he had good cause to dispense with notice and comment procedures. The district court concluded that the Secretary's principal asserted rationale for good cause—that time did not permit a more extensive procedure—was insufficient as a matter of law

to justify dispensing with the rule making procedures prescribed in section 553. We disagree.

This Court has twice considered the "good cause" exception to the APA. In *American Iron & Steel Institute v. EPA*, 568 F.2d 284 (3d Cir. 1977), we held that the Environmental Protection Agency (EPA) was not excused from compliance with the APA in promulgating regulations governing iron and steel manufacturing processes, even though the EPA asserted that a court order had imposed time constraints on the agency. We stated in that case that the good cause exception should be construed narrowly, and noted the legislative intent that " ' "[i]mpracticable" means a situation in which the due and required execution of the agency functions would be *unavoidably prevented* by its undertaking public rulemaking proceedings.' " 568 F.2d at 292 (quoting S.Rep.No.752, 79th Cong., 1st Sess. 16 (1945)). Similarly, in *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979), this Court held that the EPA lacked good cause to circumvent notice and comment procedures in issuing air quality standards for four areas of Pennsylvania, even though the EPA asserted that Congress had im-

---

4. The complete published text states:

*Justification for Dispensing with Notice of Proposed Rulemaking*

These interim regulations are effective October 1, 1981, the effective date required by Pub.L. 97–35. Since the legislation was not signed into law until August 13, 1981, it was not feasible to issue these rules under a Notice of Proposed Rule Making, as this would have delayed issuance of final rules until well past October 1, 1981. Since the amendments made by Pub.L. 97–35 will require many changes in State AFDC plans and agency procedures, States must have some reasonable assurance that new Federal rules under which these changes are to be implemented will not change in "mid-stream." Furthermore, the State costs of sequential changes in the program because of abrupt changes in Federal rules will be significantly higher than if the changes are made by States in a planned and orderly manner. The only way to assure States that significant changes in Federal policy will not be made after they have begun to implement the provisions of the new statute is to issue interim rules.

In addition, publishing interim rules will permit the State and Federal governments to capture the greatest amount of cost savings from these provisions and this will be to the benefit of the public. We anticipate that the savings to Federal and State governments from prompt implementation of these amendments will be about $2 billion and represent a substantial factor in the President's efforts to curb inflation and revitalize the economy. Accordingly, we believe that under 5 U.S.C. 553(b)(B) good cause exists for waiver of Notice of Proposed Rulemaking since issuance of proposed rules would be impracticable and not in the public interest.

While notice of proposed rulemaking is being waived, we are interested in comments and advice regarding changes which should be made to these interim rules. We will review any comments on these rules which we receive on or before November 20, 1981, and will publish the final rules with any necessary changes.

posed severe time constraints on the agency.[5]

The district court apparently inferred from these cases that, as a matter of law, shortness of time can never constitute good cause for invoking the section 553(b)(B) exemption. 527 F.Supp. at 188–190. We read the two cases more cautiously. In neither situation did we suggest that a lack of time would in every case fail to constitute good cause. At its extreme such a principle would make little sense. Indeed, such reasoning would eliminate the express provision which Congress has inserted in the APA. If Congress on October 1 ordered HHS to promulgate regulations by October 2, it is manifest that HHS would have good cause to do so without a notice and comment procedure. To rule otherwise would defeat a clear mandate of Congress because of procedural requirements that Congress undoubtedly did not mean to apply. The present case is somewhat less dire; Congress provided HHS with 49 days rather than one, and required promulgation of rules within that time only by implication rather than explicitly. Yet, if the present case differs from the suggested example, it is also quite different from the setting of *Sharon Steel* and *American Iron and Steel.*

In both of those cases, we concluded that the agencies that had waived notice and comment procedures could reasonably have fulfilled their statutory duties while carrying out those procedures. *American Iron and Steel* involved regulations that the EPA had been under order to promulgate from 1973 until 1976, a three year period, when the interim final rules were promulgated. No equivalent delay by HHS has been shown in the case before us.[6] In *Sharon Steel* the EPA faced a somewhat constricted schedule set by Congress for promulgating rules based on state-submitted plans for implementation of the Clean Air Act, 42 U.S.C. § 7401–7626. Under the Act, the states were required to submit plans to the EPA by December 5, 1977, the Administrator of EPA had to review those plans by February 3, 1978, and the states had to implement the approved plans by January 1, 1979—more than a year after the plans were submitted to the agency. The EPA argued that the time between the agency's receipt of the state plan and the completion of review by the agency did not permit notice and comment procedures to be followed in that review. We noted, however, that the agency could at least have published the state-submitted plans themselves, if not the agency's revision of those plans, within days of receiving the state-submitted plan, and thereby could have complied with the section 553 requirement that "either the terms or substance of the proposed rule or a description of the subjects and issues involved" be disclosed. The

---

**5.** Other courts of appeals have also construed the good cause exception narrowly. The Fifth Circuit, in a case presenting an issue similar to the one that we confronted in *Sharon Steel*, stated that

[T]he mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception.... The deadline is a factor to be considered, but the agency must still show the impracticability of affording notice and comment.

*United States Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979). *Accord, United States Steel Corp. v. EPA*, 649 F.2d 572 (8th Cir. 1981); *Western Oil & Gas Association v. EPA*, 633 F.2d 803 (9th Cir. 1980); *State of New Jersey v. EPA*, 626 F.2d 1038 (D.C.Cir.1980). Those cases all reached the same conclusion that we did in *Sharon Steel*—that the deadline imposed on EPA by Congress for the issuance of rules based on state-submitted implementa-

tion plans did not provide the EPA with good cause to dispense with notice and comment procedures. *E.g., United States Steel Corp. v. EPA*, 595 F.2d at 214 (5th Cir.). *But see United States Steel Corp. v. EPA*, 605 F.2d 283 (7th Cir. 1979) (reaching opposite conclusion), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). *See generally The "Good Cause" Exceptions: Danger to Notice and Comment Requirements Under the Administrative Procedure Act*, 68 Geo.L.J. 765 (1980).

**6.** *Cf. Council of the Southern Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C.Cir.1981) (recognizing the narrowness of the good cause exception but holding that an imminent statutory deadline could constitute good cause when an agency had done all in its power to act as expeditiously as possible and time constraints precluding notice and comment were in no way ascribable to the agency).

EPA could then have reviewed comments received on those proposed plans and issued final plans early enough so that the states would still have had ample time to implement them. 597 F.2d at 380.

HHS maintains that no such approach was available here. Even if HHS had been ready to publish a proposed set of rules on August 13—an accomplishment difficult to imagine—[7] the steps to be carried out before October 1 under the APA would have been virtually impossible: approval by the Secretary, publication in the Federal Register, receipt of, consideration of, and response to the proposed regulations by interested parties from all over the nation, receipt of comments by HHS, review of comments, modification of rules, final approval by the Secretary, clearance by the Office of Management and Budget, and final publication in the Federal Register. Yet if HHS—a department with responsibilities that go well beyond the promulgation of these particular rules—had failed to complete these tasks substantially in *advance* of October 1, so that all 50 states in turn could implement their own regulations with authoritative guidance from the federal government as the statute clearly requires, the October 1 effective date of the OBRA amendments would have been rendered ineffectual.

The appellees allege that Congress, in setting an October 1 effective date for the OBRA amendments, did not mandate that the AFDC rules actually be promulgated by that date. Although the district court did not expressly find that the states could have implemented their own AFDC plans without federal guidance, see 527 F.Supp. at 193, we are persuaded by the arguments of the appellants that at least nine of the interim rules invalidated by the district court involved matters of substantial HHS discretion that the states could not have resolved in the absence of federal regulations, see 527 F.Supp. at 196–199. The statute does require that the states be able to implement the OBRA amendments on October 1 unless special circumstances of a particular state warrant a waiver of that deadline. See Pub.L.No.97-35, § 2321(b). Consequently, the legislation must be construed as requiring HHS to provide states with reliable guidance at least on those discretionary issues in time for the states to implement the changes on October 1. Indeed, in light of the great attention Congress and the President gave to OBRA and the apparent urgency which they attributed to its implementation, it is clear that Congress meant for HHS to furnish the states with swift and reliable guidance in implementing the entirety of the OBRA amendments. We do not consider unreasonable the judgment of the Secretary that the states would

---

7. The district court observed that HHS decided as early as May 1981 that notice and comment procedures would be impracticable for these rules. The dissent suggests that this decision, made five months in advance of the effective date of OBRA, indicates that HHS had considerably more time than the 49 days that the Department asserts were available. Yet it can hardly be argued that HHS was required to circulate proposed rules *prior* to the enactment of the statute that the rules purport to interpret. Indeed, it is difficult to see how HHS could even finish drafting the rules until the statute was finally approved. OBRA was not an ordinary or readily predictable piece of legislation; it was a highly controversial matter that was the subject of great public attention and concern. Until it was approved, the possibility of modification or compromise remained quite real.

Even after OBRA was finally signed into law, it is not clear that circulation at that time of a preliminary draft of HHS rules, which would do little more than reiterate statutory provisions that were already public knowledge, would constitute an adequate and effective substitute for circulation of a final draft.

We do not, therefore, agree that the decision of HHS in May to dispense with notice and comment procedures somehow signifies dilatory conduct on the part of the Department. Rather, the Department's early recognition that those procedures would be impracticable reflects an awareness and anticipation of the time constraints that would inevitably result from enactment of a statute that Congress and the President considered urgent and which was being amended almost up to the time of its ultimate passage. The Department's conduct also reflects an effort to provide as much opportunity for comment as time limitations would, as a practical matter, permit.

be unable to rely with sufficient assurance on draft regulations or proposed rules while a notice and comment procedure was under way, and that they would require at least interim rules upon which they could rely.

Neither *Sharon Steel* nor *American Iron and Steel*—nor for that matter, any other decision brought to our attention—has held that good cause is lacking as a matter of law when an agency has been under congressionally-set time limits as stringent as those involved here.[8] We believe that Congress, by setting an effective date so close to the date of enactment, expressed its belief that implementation of the amendments to the AFDC program was urgent. We cannot say that HHS, by paying heed to that congressional concern in its determination that it had good cause to promulgate interim final rules without full notice and comment, erred as a matter of law.[9]

We observe an additional distinction between this case and those involving the EPA: the source of the procedural requirement involved. In *Sharon Steel*, we noted that if an act of Congress presented totally foreseeable impediments to compliance with the mandate of the APA, Congress could be expected to state explicitly when the conflicting procedures can be disregarded. 597 F.2d at 380. In the absence of such a statement, it may often reasonably be inferred that Congress does not consider the burdens it has placed upon an administrative agency to constitute "good cause" for disregard of the notice and comment requirement. But in this case, as discussed above, the effective date of OBRA does not create a conflict with *the APA itself*, but with *the policy of HHS* waiving the benefit and grant exemption of § 553(a)(2). This is so since Congress specifically does not require notice and comment where grants or benefits are involved, and it is only the policy statement of HHS—itself containing a good cause exception—that presents any possible conflict with the mandate of OBRA. Congress surely is not obliged to state explicitly that statutes it enacts fit

**8.** The EPA cases discussed in note 5, *supra*, like *Sharon Steel*, involved deadlines substantially more distant than those involved here. In other cases the deadline, although looming near at the time an agency invoked good cause, was not set by Congress at the same time that the agency was charged with promulgating the regulations, but instead was set well before so that the agency could have had more time had it acted sooner. *In Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796 (Em.App.1979), for example, the court held that the Department of Energy lacked good cause to dispense with notice and comment in issuing regulations reflecting the imminent expiration of the Economic Stabilization Act, 84 Stat. 799 (1969)—an event presumably foreseeable substantially in advance, and certainly not the basis for an inference of a specific congressional intent that regulations be issued within a specified period of time.

Where time truly has been short, through no fault of the agency, courts recognizing the narrowness of the good cause exception have nevertheless found that deadlines could constitute good cause in some circumstances. *See, e.g., Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309 (8th Cir. 1981) (imminent Airline Guide publication date justified abbreviated notice and comment process for urgent FAA regulation); *American Federation of Government Employees, AFL–CIO v. Block*, 655 F.2d 1153 (D.C.Cir.1981) (sudden need for new regulations pursuant to court injunction, where regulations provide necessary guidance to poultry industry and serious economic harm would result from absence of guidance, could constitute good cause); *Arizona State Dep't of Public Welfare v. Department of Health, Education and Welfare*, 449 F.2d 456 (9th Cir. 1971) (HEW had good cause to issue AFDC regulations without notice and comment because of need to provide guidance prior to imminent hearings).

**9.** If we decided here, as we did in *Sharon Steel*, that the Department lacked good cause for dispensing with notice and comment, then interim rules might not be saved by the 60-day notice and comment period it provided following implementation of the rules. As we stated in *Sharon Steel*,

Provision of prior notice and comment allows effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument. After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decisionmaker is likely to resist change.

597 F.2d at 381. In this case, however, where we have held that the Department was not obliged to conduct a notice and comment procedure prior to implementing the rules in question, a post-implementation procedure reflects a prudent concern on the part of the Department with providing at least some opportunity for public comment.

within exceptions to regulations or policies formulated solely by an administrative agency. Thus, congressional silence in this instance in no way reveals an intent on its part that the good cause exception not apply.

In short, if the appellees and the dissent are correct, and the HHS notice and comment policy did override the OBRA effective date, then these procedures would serve to postpone nationwide a major piece of legislation which Congress, after full public debate, had decided should be in place by October 1. Neither *Sharon Steel* nor *American Iron and Steel* involved procedural requirements that would forestall implementation nationwide of rules with little substantive effect beyond that of the statutory requirements they adhere to, on a date explicitly and recently set by Congress, relating to a comprehensive federal program.

### C.

▮ The district court held not only that HHS was legally in error in determining that good cause existed to dispense with notice and comment procedures, but also that the Department's determination of impracticability was erroneous and therefore "both arbitrary and an abuse of discretion." 527 F.Supp. at 190. In reaching this result, the district court recognized that the Department's determination was entitled to considerable deference by a reviewing court. As this Court stated in *American Iron and Steel Institute v. EPA*, 526 F.2d 1027, 1047 (3d Cir. 1975), "we must not substitute our judgment for that of the agency, but must determine whether the Administrator's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" To make such a determination, a court "must consider whether the decision was based on

a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

▮ The record does not support the district court's conclusion that the Department's determination of impracticability was so unsupported by evidence as to be "arbitrary" or otherwise improper under the above standard. The district court was of the opinion that a notice and comment procedure would have been feasible within the time allotted to HHS. It is perhaps arguable that the procedures suggested by the district court—publication of draft regulations on August 13, review of comments while final approval of the Secretary was obtained and other requisite steps were followed—might have been completed with adequate speed. But whether or not the district court's observation in this respect was "clearly erroneous," its after-the-fact suggestion of an alternate procedure which might have been successful is insufficient in this case to overcome the substantial evidence supporting HHS' judgment.[10] And there is ample support on the record to justify the Department's determination in August—or in May—that procedures such as those later suggested by the district court were impracticable under the circumstances. Given the extremely short period available to the Department, the need for time carefully to review comments if the procedure is to be effective, and the period of 39 days in fact required by HHS to promulgate its rules even without a notice and comment procedure, we conclude that the determination of impracticability by HHS was completely reasonable, and hardly arbitrary. Because, for the reasons discussed above, we also have concluded that the determination by HHS was not incorrect as a matter of law, we hold that the

---

10. When a district court does not sit as a trial court but instead reviews the findings of another court or agency, "its evaluation of the evidence is not shielded by the 'clearly erroneous' standard of Fed.R.Civ.P. 52(a), which applies

only to a *trial* court sitting as a fact finder." *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98 at 102 (3d Cir. 1981) (emphasis added).

district court erred in declaring the HHS rules invalid.[11]

### III.

■ In its order, the district court went beyond a declaration that the federal rules were invalid; it also enjoined the Commonwealth of Pennsylvania from implementing its own state AFDC regulations reflecting the OBRA amendments. The only asserted ground for enjoining implementation of the Pennsylvania regulations was that those regulations were based on, and thus were "pervasively tainted" by, the purportedly invalid federal rules. 527 F.Supp. at 193–194. Pennsylvania challenges the injunction against it as unwarranted even if we were to agree that the HHS rules were procedurally defective, and raises several contentions in support of its challenge. It asserts that an injunction against implementation of its regulations works a severe hardship on the Commonwealth and its citizens, in that Pennsylvania is thereby forced to continue paying benefits at a higher level than that for which the federal government is authorized to reimburse it, even though Pennsylvania's conduct has been conceded by all to be proper.[12] Pennsylvania also argues that even in the absence of valid HHS rules it was obliged, or at the very least authorized, to implement regulations of its own reflecting the OBRA amendments; it maintains that as long as its own regulations were promulgated in conformity with state procedural requirements, as it

is conceded that they were, there exists no basis for an injunction.[13] Finally, it contends that even if some of its regulations were correctly held to be so "tainted" by the HHS rules that the Pennsylvania regulations must fall with the federal rules, the district court could at most have invalidated only those particular state regulations that were demonstrably based on invalid federal rules and not the entire body of state regulations.

We are considerably troubled by the issues Pennsylvania raises. Even if we were to accept the analysis of the district court with respect to the HHS rules, we would find it difficult to explain why Pennsylvania, a party that has satisfied all procedural requirements in promulgating its own regulations, is the sole target of the district court's injunction and must bear the financial burden imposed by the court. Our concern is heightened by the claim that any state benefits paid now, in excess of the amount provided for by Congress, will deplete a fixed pool of money available for later benefits—in most cases to persons in a status of greater need than those losing benefits under the amendments at issue here.

We find it unnecessary, however, to decide whether the district court's rationale for enjoining enforcement of the Pennsylvania regulations was correct. Having decided that the federal rules are valid, it necessarily follows that nothing in those

---

**11.** A similar result was recently reached by the United States District Court for the Southern District of Ohio in *The Ohio State Consumer Education Association v. Schweiker,* No. C–1–81–933 (Jan. 4, 1982).

Appellants here also defend the validity of the challenged rules by asserting that the rules are interpretative rather than substantive, and they invoke the § 553(b)(A) exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." The district court held that 33 of the rules were substantive and the remainder interpretative. Because we hold that these rules are exempt under § 553(b)(B), we do not decide whether this second asserted exception would also apply. For similar reasons, we do not decide the challenge, raised on cross appeal by the appellees, to the district court's determina-

tion that the remainder of the rules were interpretative and thus within the § 553(b)(A) exception.

**12.** Indeed, appellees have had great difficulty in suggesting a course of conduct available to Pennsylvania by which it could have avoided the predicament in which it now finds itself.

**13.** Although the Pennsylvania law requires notice and comment procedures for administrative rulemaking, that law contains a provision, analogous to 5 U.S.C. § 553(a)(2), exempting from notice and comment requirements any rulemaking having to do with grants or benefits or contracts. 45 Penn.Stat. § 1204(1)(iv). Unlike HHS, the Pennsylvania DPW has not waived the grant and benefit exemption from notice and comment procedures.

rules could "taint" and thereby invalidate the Pennsylvania regulations. We therefore hold that the district court's injunction must be withdrawn.

## IV.

The consequences of the OBRA amendments for AFDC recipients are considerable. Many will lose their benefits altogether; many others will receive substantially smaller sums. Although it is the judgment of Congress that the affected families are less needy than those who remain eligible, it can hardly be denied that the termination of benefits will work a hardship on families already pressed by financial exigency. This is certainly a matter of public concern, and we respect the perseverance and dedication with which the appellee organizations have sought to protect the interests of their members in challenging these reductions in benefits.

Yet it bears emphasis, because the point is easily missed amid the concern over the reduction in benefits, that the validity of the benefit cuts is in no way before this Court. The reduction in benefits involved here is plainly required by OBRA—a fully debated act of Congress—and not by the implementing rules of HHS. To the extent that the appellees wish to comment on the desirability of benefit cuts, the time for such comments passed with the enactment of OBRA. At issue now are simply the rules of HHS implementing the clear statutory directive. HHS may not undo what Congress and the President have done; its discretion with respect to reducing benefits is quite narrowly defined. In judging the validity of the procedure by which its rules were promulgated, we must not be swayed by our views of the desirability of the underlying statutory policy that HHS is bound to implement.

We hold that the AFDC rules published on September 21, 1981, were necessary to comply with the mandate of Congress that the statute take effect on October 1, 1981, and that the Secretary had good cause, within the meaning of the APA and the HHS policy extending the APA to the rules in question, to dispense with a notice and comment procedure in order to promulgate the rules with the swiftness called for by Congress. We further hold that the district court erred in enjoining Pennsylvania from acting in reliance on its own state AFDC regulations. Accordingly, the order of the district court will be reversed.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

This case comes to us on appeal from an Order of Chief Judge Lord, dated November 20, 1981, which enjoins the state defendant, Secretary O'Bannon, from implementing state regulations passed pursuant to the Omnibus Budget Reconciliation Act (OBRA). Among other things, OBRA amended the Aid to Families with Dependent Children (AFDC) program to reduce or eliminate federal funding for a number of categories of previously eligible recipients under the state-administered AFDC program. Secretary Schweiker, alleging good cause under the Administrative Procedure Act (APA), dispensed with the notice and comment provisions of the APA. The gravamen of Chief Judge Lord's opinion is that good cause did not exist, either in law or in fact, and, consequently, the regulations promulgated by Secretary Schweiker were invalid. Further, because the state regulations promulgated by Secretary O'Bannon were virtually identical to the invalid federal regulations and looked in substantial part to an exercise of discretion by Secretary Schweiker for their substantive content, the federal defendant's violation of the APA could only be remedied by enjoining the state defendant whose role it is to administer the AFDC program.

The majority opinion concludes that Chief Judge Lord "erred in declaring the federal rules invalid and in enjoining the Pennsylvania rules." Majority Opinion, at 888. Because I believe that Chief Judge Lord's opinion was legally correct and not clearly erroneous on the issue of a federal violation, I dissent from the majority's reversal on this ground.

## I.

The majority's recitation of the history of the AFDC program is sufficient and does not need to be repeated. What does bear repeating is the chronology of events regarding the promulgation of the federal regulations.

Congress enacted OBRA into law on August 13, 1981. In anticipation of the passage of OBRA, the Department of Health and Human Services (HHS) formed a study group in May of 1981. The group included federal and state officials and was charged with the duty of formulating a timetable to ensure timely promulgation of any necessary regulations. It was at this point, "almost six months before the actual effective date of OBRA, [that] HHS decided to avoid the usual notice and comment procedures mandated by the Administrative Procedure Act (APA), 5 U.S.C. §§ 500–576, and instead to issue interim final regulations implementing OBRA." District Court Opinion, at 185.

The effective date of OBRA was October 1, 1981. On July 22, 1981, HHS wrote to 32 interested organizations informing them that Congress had under consideration legislation which would affect AFDC. The letter solicited suggestions for regulations but did not contain any draft regulations. The letter requested written comments by August 7, 1981. Not surprisingly, only one of the 32 organizations responded and it complained of the short period of time and the proposed use of interim final regulations. The federal defendant made no effort to recontact any of the organizations after the draft regulations were developed.

HHS conducted conferences on September 13 and 15, 1981. Participation in these conferences was limited to state administrators. On September 3, 1981, Secretary

Schweiker approved a proposed set of regulations which were then published in the Federal Register on September 21, 1981. The regulations were to take effect October 1, 1981 leaving only nine days for comment *prior* to OBRA's and the regulations' effective date.

The majority observes that "few comments on the rules were received by HHS. Indeed, no comment was received from the appellee organizations until November 19, 1981." Majority Opinion, at 880. Yet, as Chief Judge Lord wrote, "the uncontroverted testimony of Ms. Betty Van Dyke, a board member of the Philadelphia Citizens in Action, one of the plaintiffs here [revealed] that her organization did not comment during the post-publication comment period because of its view that the agency [HHS] had already made up its mind." District Court Opinion, at 192.

Pennsylvania, after reviewing the regulations in the Federal Register, promulgated regulations on November 7, 1981 with an effective date of November 9, 1981. Although based on the federal regulations, it is Pennsylvania's November 7, 1981 regulations which result in the complete cutoff of AFDC benefits to 17,840 households comprising 53,520 persons. An additional 23,-950 households composed of 57,050 persons will have their AFDC benefits reduced an average $133.49.

## II.

It is the appellees' contention that the federal defendant violated the APA when he elected to dispense with prior notice and comment.[1] The relevant section of the APA states as follows:

(b) General notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are

1. The majority in a footnote expresses concern over the appellees' standing to assert a violation of the APA. Majority Opinion, at 880 n.1. To the extent that the majority's concern does not alter their conclusion that appellees do have standing, I consider the text of the footnote to be dicta and will not address it. However, I believe that the majority's focus on the injury in fact inherent in OBRA is mislead-

ing and incorrect. The appellees recognize that they are without a basis for challenging OBRA at this time. Rather, they are arguing that the APA creates procedural rights which have been denied them without good cause. It is this injury which has in fact caused the harm to the appellees. Clearly, they have the requisite interest in a statutorily created procedural right to make their standing obvious.

named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rulemaking proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency, organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b). The appellants concede that § 553(b) is applicable to this case. Thus, the only issue presented under these facts regarding the APA is whether the federal defendant had good cause under § 553(b)(B) to dispense with notice and comment.

Chief Judge Lord concluded, after closely examining our decisions in *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979) and *American Iron and Steel Institute v. EPA*, 568 F.2d 284 (3d Cir. 1977), that, as a matter of law, the federal defendant lacked good cause. He reasoned as follows:

In both *American Iron and Steel* and *Sharon Steel Corp. v. Environmental Protection Agency*, 597 F.2d 377, 380 (3d Cir. 1979), the Third Circuit held expressly that time pressure on an agency caused by rapidly approaching effective dates for the underlying legislation does not constitute good cause for dispensing with the APA's normal notice and comment requirements. The discussion in *Sharon Steel* on this issue is particularly instructive:

In enacting amendments to the Clean Air Act, Congress gave no explicit indication that it intended to override the procedural safeguards of the APA. The amendment set the December 5, 1977, deadline for submission of state designations, the February 3, 1978, deadline for the Administrator's review, and the January 1, 1979, deadline for state implementation plans. Even at the time when Congress passed the amendments to the Clean Air Act, the circumstances that the Administrator advances as good cause should have been apparent. Nonetheless, Congress nowhere recorded any *express indication* that the 1977 amendment should relieve the Administrator from the ordinary procedures set forth in the APA for rulemaking.

*Sharon Steel*, 597 F.2d at 380 (emphasis added).

Finally, it is also crystal clear under applicable Third Circuit precedents that a period for comment following publication of final regulations is not a valid substitute for the normal provisions of the APA:

We hold that the period for comments after promulgation cannot substitute for the prior notice and comment required by the APA. If a period for comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the Congressional decision that notice and an opportunity for comment must precede promulgation. Provision of prior notice and comment allows effective participation in the rulemaking process while the decision maker is still receptive to information and argument. After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decision maker is likely to resist change.

*Sharon Steel*, 597 F.2d at 381.

Under these precedents, I hold as a matter of law that the federal defendant did not have "good cause" for dispensing with the notice of proposed rulemaking

otherwise required under the APA. The main justification asserted for this action, that the OBRA passed only forty-eight days before its scheduled effective date, has been explicitly and repeatedly rejected as good cause in the Third Circuit. The logic of Judge Rosenn's analysis in *Sharon Steel* is inescapable: to hold otherwise would allow Congress to override the notice and comment provisions of the APA merely by placing an effective date in every statute that put some time pressure on the administering agency. It is eminently more reasonable to expect Congress to enact an express override to those provisions of the APA when it wishes to achieve that result. Finally, neither the informal pre-publication comments solicited by HHS nor the more formal post-publication comment period provided for in the September 21, 1981 promulgation is sufficient to cure this fatal defect.

District Court Opinion, at 189–190.

The majority rejects Chief Judge Lord's conclusion by "read[ing] the two cases more cautiously." Majority Opinion, at 883. Their caution involves constructing a hypothetical case whereby "Congress on October 1 order[s] HHS to promulgate regulations by October 2." *Id.* They then conclude that, "it is manifest that HHS would have good cause to do so without a notice and comment procedure." *Id.* The critical flaw in the majority's hypothetical is the word "ordered." Of course, Chief Judge Lord recognized that if OBRA contained an express statutory override of the APA good cause would exist. The emphasis he added to the excerpt from *Sharon Steel* regarding an "express indication" demonstrates Chief Judge Lord's awareness of the majority's proposition. However, the fact remains that OBRA does not contain an "express indication" of such an intent by Congress.

The majority's attempt to narrow and distinguish *Sharon Steel* from the present case is also unpersuasive. In *Sharon Steel*, the EPA argued that the shortness of the period from December 5, 1977, when the states were required to submit Clean Air Act implementation plans, to February 3, 1978, when the EPA had to complete their review of the plans, necessitated dispensing with notice and comment. We rejected the EPA's argument because the EPA could have published the state-submitted plans upon receipt and this would have constituted sufficient notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553.

In the present case, Chief Judge Lord found that "HHS made its decision to dispense with normal notice and comment procedures in May 1981, almost six months before the actual effective date of the statute." The majority does not assert that this finding is clearly erroneous. The facts here are less compelling for a finding of good cause than *Sharon Steel*. If a two month time period is not sufficient to overcome the narrowly construed good cause exception, I do not understand how an agency with six months can claim good cause. Similarly, there is no evidence to indicate that " 'the agency functions would be *unavoidably prevented* by its undertaking public rule-making proceedings.' " *American Iron and Steel*, 568 F.2d at 292 *quoting* Senate Rep.No.752, 79th Cong., 1st Sess. 16 (1945) (emphasis in original).

The absence of any need to dispense with notice and comment is further demonstrated by Chief Judge Lord's independent factual findings. He found as follows:

Putting this theoretical evidence aside, and looking instead to how HHS actually developed these regulations, I still conclude that no good cause existed. The record is clear that HHS had a rough draft of proposed regulations on August 13, the same day OBRA passed. (See Exhibit P–2) Although it is also true that this draft was extremely preliminary, there is no reason why [a Notice of Proposed Rule Making] could not have been published on or shortly following the August 13 date. Under the APA, a NPRM need contain "*either* the terms or substance of the proposed rule *or a description of the subjects and issues in-*

*volved.*" 5 U.S.C. § 553(b)(3) (emphasis added). Following that publication, HHS could have taken the identical steps that it performed to meet its objective of publishing an interim final rule before October 1, 1981. It could have circulated that draft to the [Association of Public Welfare Administrators], it could have developed a new draft based on the comments on the first draft, it could have added the comments that would have come in as a result of publication of the NPRM, it could have circulated a new draft to the APWA in early September, it could have put its final draft through OMB and HHS clearance procedures, and it could have held the two conferences in Arizona and Pennsylvania for the benefit of state administrators to provide them guidance on implementation of OBRA. The fact is that HHS polished that August 13, 1981 draft into interim final regulations which had cleared all HHS and OMB administrative obstacles by September 21, 1981, ten days before the effective date of the statute.

Viewed in this light, it is inconceivable how the federal defendant can maintain that, had it chosen to pursue the NPRM procedure in May 1981, it would not have been able to promulgate final regulations by October 1, 1981. The only additional burden placed on HHS had it published the regulations as a NPRM is the burden of reviewing the additional comments that that publication would generate. The federal defendant appears to argue that all work would have had to cease during the minimum thirty day comment period mandated by the APA. Nothing in the record supports such a contention. Thus, from the middle of August until the middle of September, during the thirty day public comment period, HHS could have continued to perform the same tasks that it actually performed during the same time period on the facts of this case. That HHS was able to transform the extremely rough working draft of August 13 into the polished regulations that appear in the Federal Register by September 3 (when the regulations were sent to OMB for clearance) is conclusive proof of its capacity to transform the hypothetical NPRM of August 13 into a final rule by the middle of September for transmittal to OMB for the same clearance.

District Court Opinion, at 191.

The standard of review for these findings is of course the familiar clearly erroneous standard. *Krasnov v. Dinan*, 465 F.2d 1298 (3d Cir. 1972). The majority does not contend that these findings of fact are clearly erroneous. Instead, they apply the abuse of discretion standard in an effort to skirt otherwise iron-clad factual findings. The majority's reliance on *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98 (3d Cir. 1981) for the proposition that the district court's findings are not subject to the clearly erroneous standard of review is misplaced. The *Universal Minerals* case concerned an appeal to our court "from an appellate decision of the district court, which reversed the judgment of a bankruptcy court in an adversary proceeding. . . ." At 100. Because the district court was not sitting as a fact finder but rather was reviewing the bankruptcy court's findings of fact made after a full hearing, the rationale for applying the clearly erroneous standard, *i.e.*, to give deference to the judge who has heard testimony and has made findings based on demeanor and credibility which are not apparent from a cold appellate record, did not exist. When the district court sits as an appellate court to review an administrative adjudicatory proceeding, "we are in as good a position as the district court to review the findings. . . ." *Universal Minerals*, at 102. The present case, however, is very different from *Universal Minerals*. The district court was sitting as the initial trier of fact and did hear live testimony from HHS officials and from the plaintiffs. There was no adjudicatory proceeding below and the entire factual record was developed in the district court. HHS was rulemaking and not conducting an adversarial hearing which would then be subject to appellate review in the district court. It is axiomatic that the district court's findings of fact

made after hearing the witnesses and observing the credibility of HHS officials cannot be reversed on appeal unless clearly erroneous. Fed.R.Civ.P. 52(a).

In my view, Chief Judge Lord was correct in following the dictates of our *Sharon Steel* and *American Iron and Steel* cases. His legal conclusions are sound and his factual findings not clearly erroneous. Consequently, I dissent from the majority's view that HHS had good cause under the APA to dispense with the procedural rights of notice and comment.

### III.

The remedial aspect of Chief Judge Lord's opinion is a closer issue and raises a question of the district court's inherent power to fashion an effective remedy capable of making the injured party as nearly whole as possible.[2] However, since the majority opinion declines to reach this issue, I will not address it.

The majority concludes that "... it can hardly be denied that the termination of benefits will work a hardship on families already pressed by financial exigency." Majority Opinion, at 888. To call cuts in a life sustaining benefits program a mere "hardship" is an understatement. Others have characterized the cuts as "The War Against the Poor." Although "Governors and Mayors understand the cuts; poor people feel them ... For poor people the issue is not an abstract matter of ideology...." N.Y.Times, Dec. 27, 1981, § E at 14. I agree with the majority that "[i]n judging the validity of the procedure by which its rules were promulgated, we must not be swayed by our views of the desirability of the underlying statutory policy that HHS is bound to implement." *Id.* at 888. I differ with the majority in that I do not believe that HHS was "bound to implement the policy" without proper notice or an opportunity to comment. In *Sharon Steel* we held that the steel companies which were polluting the air by their manufacturing process had a right to continue polluting the environment until they received from the federal government agency the procedural rights they were due under the APA. Similarly, I believe that 41,790 indigent families and 110,570 poor people have as much a right to the same type of procedural protection under the APA as the two steel companies did in *Sharon Steel*.

**2.** Chief Judge Lord reasoned that

> both the testimonial and documentary record establish conclusively that the Commonwealth relied to an extremely significant extent on these invalid federal regulations. A simple comparison of the wording of the promulgated state regulations with the wording of the invalid federal regulations shows that time and again the Commonwealth merely copied the precise language from the federal regulations. Further, the explanatory material published by the Commonwealth accompanying its promulgation of state regulations states numerous times that its regulations are based on, required by, or follow the federal regulations. Finally, in several instances, such as the part-time worker earned income and child-care disregard sections, the Commonwealth regulations exercise authority specifically delegated to HHS. Absent subdelegation from HHS, which in at least those two instances has been provided in the invalid regulations, the Commonwealth has no authority to regulate on these matters.

> Thus, I hold that the Pennsylvania regulations promulgated on November 7, 1981 (to be effective November 9, 1981) are so pervasively tainted by the invalidity of the federal administrative process that allowing implementation of OBRA pursuant to these regulations would be equivalent to allowing a violation of the APA to stand unremedied. If the federal government can issue defective interim final regulations and the states can rely on them and implement federal programs pursuant to those regulations, then the plaintiffs would be deprived of their statutory right to comment on the implementing regulations before experiencing the adverse action authorized by the statute and invalid federal regulations. Thus, if my holding that the federal government violated the APA is to have any substantive effect at all, I must enjoin the state from implementing the provisions of OBRA in reliance on state regulations pervasively tainted by invalidly promulgated federal regulations.

District Court Opinion, at 193–194.