2004 VT 108

# Susann Hunter, Robin Gagne and Jane Doe v. State of Vermont, M. Jane Kitchel and Eileen Elliott

[865 A.2d 381]

No. 03-013

Present: Amestoy, C.J.,[1] Dooley, Johnson, Skoglund and Reiber, JJ.

Opinion Filed October 22, 2004

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*John J. McCullough III* and *Mark Loevy-Reyes* of *Vermont Legal Aid, Inc.*, Montpelier, for Plaintiffs-Appellants.

*William H. Sorrell*, Attorney General, Montpelier, and *Susan R. Harritt*, Assistant Attorney General, Waterbury, for Defendants-Appellees.

¶ 1. **Dooley, J.** The principal question presented is whether, consistent with the separation-of-powers provision of the Vermont Constitution, the General Assembly validly delegated to the Secretary of Administration and the Joint Fiscal Committee the authority to prepare and implement a deficit-prevention plan to address a revenue shortfall while the Legislature was not in session. A subsidiary question is whether the Department of Prevention, Assistance, Transition and Health Access (PATH) complied with emergency rulemaking procedures in implementing the reductions called for in the deficit-prevention plan. Plaintiffs challenged the plan, and the superior court ruled that the plan did not violate the separation-of-powers doctrine, but that PATH had failed to provide proper notice and hearing before adopting the emergency rule. We affirm the court's ruling that the delegation of authority was constitutionally permissible, and reverse the superior court determination that the emergency rule violated the Administrative Procedure Act, finding instead that PATH complied with the requisite rulemaking procedures.

¶ 2. The facts are briefly summarized as follows, although additional material facts are provided in the discussion. The Fiscal Year 2003 Appropriations Act (Act), enacted at the conclusion of the 2002 legislative session, contained a final section directing the Secretary of Administration (Secretary) — in consultation with the legislative leadership and "relevant committee chairs" — to prepare and present to the legislative branch Joint Fiscal Committee (JFC) a "deficit prevention plan" in the event that: (1) the official state revenue estimates of the emergency board for the general fund, the transportation fund, or federal funds were reduced by two percent or more from the estimates adopted by the board on January 15, 2002;[2] (2) the General Assembly was not in session; and (3) the plan was "necessary to ensure a balanced budget in the general fund or the transportation fund." 2001, No. 142 (Adj. Sess.), § 324(a), (d). The JFC could accept, reject or amend the plan, and the Secretary was then empowered to implement the plan as approved. *Id.* § 324(d).

¶ 3. The Legislature adjourned in late June 2002. After adjournment, the chairs of the House and Senate Appropriations Committees prepared and signed a "Statement of Intent to the Budget Act." That statement provided that § 324 was intended to provide temporary rescission authority to address revenue shortfalls. It further stated that it was the intent of the appropriation act conferees that PATH could invoke emergency rulemaking procedures to implement any program change "where it is necessitated by the imminent peril to public welfare posed by the revenue shortfall and the need through prompt exercise of rescission authority to avert or mitigate a state budget deficit." Statement of Legislative Intent, Omnibus Appropriations Act, 2001, No. 142 (Adj. Sess.), available at Joint Fiscal Office.

¶ 4. In July, the emergency board predicted a revenue reduction in excess of four percent of the general fund from the January 2002 estimate, thereby triggering the Act's deficit-prevention provision. The Secretary, in response, developed a deficit-prevention plan and presented it to the JFC, as the Act required, on August 12. The plan recommended reductions in excess of $23 million, including cuts below the appropriation to PATH of nearly $4 million. The proposed reductions to PATH's budget included the elimination of adult chiropractic

---

[2] Under 32 V.S.A. § 305a, the emergency board is required to periodically determine official state revenue estimates.

coverage for Medicaid and Vermont Health Access Plan (VHAP) recipients, suspension of denture coverage for Medicaid recipients, and the elimination of VHAP coverage for elective inpatient hospital admissions.[3] After several meetings, the JFC adopted the plan on August 23. On September 5, PATH filed an emergency rule to implement the budget reductions articulated in the plan, to become effective on October 1. PATH refiled the emergency rule on October 16, to reflect an amended implementation date of November 1.

¶ 5. In late October, plaintiffs — three individuals affected by PATH's proposed reductions — filed a complaint against the State, Agency of Human Services Secretary Kitchel, and PATH Commissioner Elliott in superior court, seeking to enjoin implementation of the plan. Plaintiffs claimed that the proposed reductions and implementing regulations were invalid because: (1) the deficit-prevention section of the Act impermissibly delegated an essential legislative function to the executive branch and legislative committee, in violation of the separation-of-powers provision of the Vermont Constitution; (2) PATH's implementation of the reductions violated certain requirements of the Administrative Procedure Act (APA), 3 V.S.A. §§ 800-849; (3) the elimination of coverage for dentures and chiropractic services violated § 148(g), (i) of the Act; (4) the elimination of chiropractic coverage violated Vermont's health insurance law; and (5) the elimination of denture services violated federal Medicaid law.

¶ 6. The trial court heard arguments on plaintiffs' motion for a preliminary injunction, and issued a written decision on November 22. The court rejected plaintiffs' separation-of-powers claim, concluding that the Constitution allowed such overlapping institutional arrangements as a means to accomplish the Legislature's limited objective of responding to a financial emergency during a period when the General Assembly was not in session. The court also rejected plaintiffs' claims that the reductions violated § 148 of the Appropriations Act, or state health insurance and federal Medicaid law. Finally, the court deter-

---

[3] Section 148(g) of the Act provided that PATH was not authorized to amend the rules governing the Medicaid program "to eliminate coverage for dentures for adults, [or] to modify the scope of coverage for dental services." Section 148(i) stated that PATH was not authorized to amend the rules governing either the Medicaid or VHAP program "to eliminate coverage for chiropractic services for adults." Plaintiffs argued to the superior court that the Secretary's deficit-prevention plan violated both those provisions. The superior court ruled that the reductions referenced in those subsections could be included in the deficit-prevention plan under § 324, despite the language of the subsections. That ruling is not before us.

mined that PATH had failed to provide adequate notice and hearing in connection with the emergency rule, in violation of the APA. The court granted the preliminary injunction as a remedy for the APA violation, but stayed its effect until December 31, 2002, to afford PATH an opportunity to comply with the notice and hearing requirements and, after it complied, to move to vacate the order granting the preliminary injunction. On December 27, the court granted defendants' motion to vacate the preliminary injunction, and also granted plaintiffs' motion for permission to take an interlocutory appeal, which this Court accepted. The court's order granting interlocutory appeal specified two issues for review: (1) whether the court erred in concluding that plaintiffs had failed to show a likelihood of success on their claim that § 324 of the Act violated the separation-of-powers doctrine; and (2) whether the court erred in staying issuance of a preliminary injunction after finding that PATH had failed to comply with the notice and hearing requirements of the APA.

## I.

¶ 7. We first address plaintiffs' claim that § 324 of the Act violates the Vermont Constitution's separation-of-powers provision by delegating the Legislature's appropriations power to the executive branch and the JFC. Because the Act authorizes the Secretary to prepare and implement a deficit-prevention plan, subject to JFC approval or amendment, plaintiffs argue that it effectively empowers the executive and a small legislative body to make budgetary decisions properly exercised only by the Legislature as a whole. See *Bowsher v. Synar*, 478 U.S. 714, 763 (1986) ("appropriating funds is a peculiarly legislative function"); *Vt. Home Mortgage Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, 279, 262 A.2d 445, 450 (1970) (Legislature may not delegate power to act as lawmaker). The defendants argue, in response, that the Act represents a constitutionally permissible delegation of limited authority within the bounds of the necessarily overlapping budgetary powers of the executive and legislative branches. As explained below, we find the defendants' position to be the more persuasive.

¶ 8. We start with a more detailed explanation of the statute under attack, the context in which it was enacted, and the relevant constitutional provisions. The Act requires three specific conditions before the Secretary is required to undertake emergency budgetary planning actions. First, official state revenue estimates of the emergency board

for one of the funds must have been reduced by two percent or more from the previous estimate; second, the General Assembly must not have been in session; and third, a deficit-prevention plan must have been "necessary to ensure a balanced budget in the general fund or the transportation fund." 2001, No. 142 (Adj. Sess.), § 324(a)(3). When all of these circumstances coexisted, the Secretary was required to prepare a deficit-prevention plan "in consultation with legislative leadership and relevant committee chairs, and . . . file the plan with the joint fiscal committee." *Id.* § 324(d). The time period within which the Secretary was authorized to act was also limited, dating from the Legislature's adjournment in June 2002 to the end of September: "The secretary shall have no authority to file a plan under this section after September 30, 2002." *Id.* The Act further required the Secretary to report to the General Assembly by November 15, 2002, "describing in detail the manner in which any deficit prevention plan has been implemented, including a discussion of the impacts of any funding reductions." *Id.*

¶ 9. The Secretary's plan was, in effect, only a recommendation to the JFC, which could approve, modify or reject it in whole or in part, as long as it acted within certain designated time limits. *Id.* The JFC is made up of ten legislators, five from each of the House of Representatives and the Senate. 2 V.S.A. § 501(a). In addition, the Act provided certain legislative guidelines or priorities to guide the Secretary and the JFC. Specifically, any deficit-prevention plan was to "be designed to minimize any negative effects on the delivery of services and on local budgets, including the delivery of tobacco fund supported youth substance abuse education and prevention services," and generally was "to reflect the priorities established by the general assembly in the fiscal year 2003 appropriations act." 2001, No. 142 (Adj. Sess.), § 324(b).

¶ 10. The plan could use a number of methods to prevent a deficit including "program and funding reductions" and "reductions in force consistent with the state's contractual obligations." *Id.* § 324(c)(1), (2). There were, however, some restrictions based on the source of funds used for deficit prevention. For example, any transfers from the tobacco settlement fund were to "be used to support grants and services for the benefit of clients of the agency of human services," and some reserve funds were not to be reduced below certain specified levels. *Id.* § 324(c)(4), (5).

¶ 11. The Act's provisions are consistent with a general provision on "Interim budget and appropriation adjustments" adopted in Title 32. This section, enacted in 1996, allows a similar process of expenditure

reduction by the Secretary of Administration, with approval in certain circumstances by the JFC. 32 V.S.A. § 704. The Secretary alone may reduce expenditures to prevent a deficit where the revenues for the general fund, transportation fund or federal funds will fall short of the official revenue estimates by less than one percent, provided that: "reductions to any individual appropriation do not exceed five percent of the appropriation's amount for personal services, operating expenses, grants, and other categories"; the plan "is designed to minimize any negative effects on the delivery of services to the public"; and it does not "have any unduly disproportionate effect on any single function, program, service, or benefit." *Id.* § 704(b)(2). If the revenue shortfall will be greater, or the Secretary proposes spending reductions not within the above limits, reductions can be implemented with the approval of the JFC. *Id.* § 704(b)(1), (f).

¶ 12. Prior to the 1996 enactment, the statutes contained general authority for the Governor to determine what portion of appropriations would be expended:

> The final decision as to what portion of any appropriation is necessary to be expended for the purposes of the appropriation shall be that of the governor, who may review the work of each department, board, commission, agency or officer in such manner as he shall determine. If the governor shall determine in any case that a lesser amount than that appropriated is required, he shall notify the department, board, commission, agency or officer affected and thereafter no expenditure in excess of the amount determined by the governor to be necessary shall be made.

32 V.S.A. § 708, repealed by 1995, No. 178 (Adj. Sess.), § 283a. This authority was enacted in 1960 pursuant to the general policy that only so much of an appropriation shall be expended "as is necessary for the purposes for which the sums are appropriated." *Id.* § 707. Although this specific authorization was repealed in 1996, the legislation did acknowledge the power to manage spending in the executive branch:

> The executive branch is authorized and encouraged to take such actions as are necessary and desirable to manage and administer state programs and agencies in an efficient, effective, and fiscally prudent manner, and to such ends may accomplish savings and reduce spending in such programs

and agencies, provided that the legislative purposes for which the sums are appropriated are substantially accomplished.

32 V.S.A. § 704a(b).

¶ 13. We turn to the relevant constitutional provisions. No provision explicitly addresses the questions before us. Chapter II gives the Legislature "powers necessary for the Legislature of a free and sovereign State," but provides little specificity on the nature of the powers. Vt. Const. ch. II, § 6. Section 2 provides that "[t]he Supreme Legislative power shall be exercised by a Senate and a House of Representatives." *Id.* § 2. Section 20 provides that the Governor "may draw upon the Treasury for such sums as may be appropriated by the General Assembly" and must "take care that the laws be faithfully executed." *Id.* § 20. Section 27 specifically addresses expenditure of funds, providing that "No money shall be drawn out of the Treasury, unless first appropriated by act of legislation." *Id.* § 27. Finally, the Constitution contains a separation-of-powers provision: "The Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." *Id.* § 5.

¶ 14. Our decisions on separation of powers are discussed below. Other than those decisions, we have only rarely considered the relevant constitutional provisions. Probably the most instructive are the early decisions on the power of the emergency board. See, e.g., *State Highway Bd. v. Gates*, 110 Vt. 67, 1 A.2d 825 (1938); *Grout v. Gates*, 97 Vt. 434, 124 A. 76 (1924). The emergency board had five members: the Governor and the chairs of the major financial committees of the House of Representatives and Senate.[4] See *Grout*, 97 Vt. at 446, 124 A. at 77. Its purpose was to provide funding for emergency needs when the Legislature was out of session. *Id.* In *Grout*, the board used part of the $100,000 appropriated to it to provide funding to the Secretary of State to meet an unexpected workload increase in registering automobiles, but the Auditor of Accounts refused to issue warrants for the expenditures. *Id.* at 447, 124 A. at 77. In resolving the dispute, this Court made clear that the "making of expenditures and appropriating public money are different things." *Id.* at 448, 124 A. at 78. It held that, under the statute, the emergency board could make emergency expenditures, but it was responsible for the expenditures so it could not "appropriate or set apart money to some department or

---

[4] Its composition remains the same. 32 V.S.A. § 131.

officer of the State to be so expended." *Id.* Because the board attempted to appropriate and set apart funds to the Secretary of State, the Court refused to order the Auditor to issue his accounts. *Id.* at 453, 124 A. at 81-82. The Court agreed that when an emergency existed, the emergency board could step in and make expenditures to respond to that emergency. *Id.*

¶ 15. In *State Highway Board*, the expenditure by the emergency board met the requirements of the applicable statute, but the Auditor of Accounts refused to implement it because he asserted that the power of the Legislature was unconstitutionally delegated to the board. 110 Vt. at 71, 1 A.2d at 827. The Court disagreed because the funds were appropriated to the board, and the board was acting to expend appropriated money and not to appropriate it. *Id.* at 79, 1 A.2d at 831. In reaching its conclusion, the Court relied on federal law allowing Congress to delegate certain implementation functions as long as it creates appropriate standards. *Id.* at 76-77, 1 A.2d at 829.

¶ 16. Before we reach the separation-of-powers and delegation issues raised by the parties, we find it helpful to analyze where the powers involved in the statute fall in the constitutional scheme. As *State Highway Board* recognized, only the Legislature has the power to appropriate funds for the support of governmental programs. The Governor is required by Chapter II, § 20 to faithfully execute the laws that are enacted by the Legislature. See 32 V.S.A. § 704a(a). In plaintiffs' view, the combination of these responsibilities means that the Governor is required to spend all appropriated funds for the purposes that the Legislature intended.

¶ 17. We agree with plaintiffs' position up to a point. The Constitution provides that the Governor "*may* draw upon the Treasury for such sums as may be appropriated by the General Assembly." Vt. Const. ch. II, § 20 (emphasis added). The language suggests that the Governor has some discretion in deciding whether to expend appropriated funds. Nevertheless, we recognize that appropriations necessarily represent legislative determinations of policy, by deciding which programs and activities to support financially and therefore who obtains intended public benefits. If the Governor has a free hand to refuse to spend any appropriated funds, he or she can totally negate a legislative policy decision that lies at the core of the legislative function.

¶ 18. The balance point between a legislature's law-making power and a governor's power to manage spending is best explained in *Opin-*

*ion of the Justices*, 376 N.E.2d 1217 (Mass. 1978). The decision is an advisory opinion to the Massachusetts Senate on the constitutionality of a bill that would prohibit the impoundment of appropriated funds without legislative approval. *Id.* at 1218. The Massachusetts court started with the proposition that appropriation of funds is exclusively a legislative power and "it is for the Legislature, and not the executive branch, to determine finally which social objectives or programs are worthy of pursuit." *Id.* at 1221. Thus, once a law has been enacted, the "Governor is obliged to execute the law as it has emerged from the legislative process" and "is not free to circumvent that process by withholding funds or otherwise failing to execute the law on the basis of his views regarding the social utility or wisdom of the law." *Id.* at 1221-22.

■ ¶ 19. On the other hand, "the activity of spending is essentially an executive task." *Id.* at 1222. As the court explained:

> Inasmuch as it is the function of the executive branch to expend funds, it must be implied that the "supreme executive magistrate," as head of one of the three coequal branches of government, is not obliged to spend the money foolishly or needlessly. The executive branch is the organ of government charged with the responsibility of, and is normally the only branch capable of, having detailed and contemporaneous knowledge regarding spending decisions. The constitutional separation of powers and responsibilities, therefore, contemplates that the Governor be allowed some discretion to exercise his judgment not to spend money in a wasteful fashion, provided that he has determined reasonably that such a decision will not compromise the achievement of underlying legislative purposes and goals.

*Id.* at 1222-23. Thus, the court answered the first question put to it — whether the Governor "has the constitutional prerogative to spend less than the full amount of an appropriation" — in the affirmative. *Id.* at 1223. It responded that the proposed bill would be unconstitutional to the extent that it always requires that a full appropriation amount be spent without legislative approval. *Id.* at 1224.

¶ 20. Other courts have relied on *Opinion of the Justices* in defining the relative powers of the executive and legislative branches in appropriation and spending decisions. See *Colorado Gen. Assembly v. Lamm*, 700 P.2d 508, 521 (Colo. 1985) (stating that whatever inherent power the Governor has over administering the state budget, it does

not extend to contradicting major legislative determinations); *State ex rel. Schwartz v. Johnson*, 907 P.2d 1001, 1002 (N.M. 1995) ("[A]bsent a proper delegation of authority from the state legislature, the executive branch is precluded from exercising any control over the expenditure of appropriated money in a manner that would affect the legislature's choice of purpose."); *Common Cause v. Commonwealth*, 668 A.2d 190, 206 (Pa. Commw. Ct. 1995) (although legislature can determine purposes for which appropriation is made, it cannot "micromanage the executive's power to administer appropriated funds"); see also *In re Opinion of the Justices*, 2004 WL 693431, at *3 (Ala. March 31, 2004) (not yet released for publication) (holding in advisory opinion that legislature could remove governor's power to transfer appropriations between programs); *State ex rel. Condon v. Hodges*, 562 S.E.2d 623, 630 (S.C. 2002) (executive branch encroached on legislative power by inducing recipient of appropriation to return part of it for reallocation by the Governor). Although the state constitutional provisions bearing on these disputes are somewhat different, the essential structures are the same and, thus, the general principles of these decisions are applicable in virtually any state. There are no substantial differences between the Vermont constitutional provisions and those of Massachusetts. Thus, we adopt the reasoning of the *Opinion of the Justices*, 376 N.E.2d 1217, for purposes of our analysis in this case.

¶ 21. Having examined the constitutional powers of the branches on appropriation and spending matters, we turn to the constitutional requirement of separation of powers. Our most extensive discussion of the separation-of-powers requirement in Chapter II, § 5 of our Constitution is in *In re D.L.*, 164 Vt. 223, 228-29, 669 A.2d 1172, 1176-77 (1995). We there explained that "[t]he division of [governmental] power serves to create a structure resistant to forces of tyranny." *Id.* at 228, 669 A.2d at 1176. Indeed, consolidation of power in any one agency of government represented — in the framers' view — "the very definition of tyranny." *Id.* To apply the requirement "we must determine the powers of each of the branches and ensure no one exercises powers belonging to another." *Id.* In this process, however, we recognize that "there must be a certain amount of overlapping or blending of the powers exercised by the different departments," *Trybulski v. Bellows Falls Hydro-Elec. Corp.*, 112 Vt. 1, 6, 20 A.2d 117, 119 (1995), and that we must construe the constitutional command consistent with efficient and effective governmental structures that are

able to respond to the complex challenges and problems faced by today's state government. We explained this process in more detail in *In re D.L.*:

> Our decisions reflect ... that more difficult issues and choices lie under the surface of separation of powers questions. Thus, we have emphasized that separation of powers doctrine does not contemplate an absolute division of authority among the three branches such that each branch is hermetically sealed from the others. Practical realities of daily government require that there must be a certain amount of overlapping or blending of the powers exercised by the different departments. Moreover, there are many powers and functions of government that defy simple or obvious classification. The focus of a separation of powers inquiry is not whether one branch of government is exercising certain powers that may in some way pertain to another branch, but whether the power exercised so encroaches upon another branch's power as to usurp from that branch its constitutionally defined function. As stated by James Madison, "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free Constitution are subverted."

164 Vt. at 228-29, 669 A.2d at 1176 (internal quotations and citations omitted). We have described our separation-of-powers requirement as "a relatively forgiving standard ..., tolerant of such overlapping institutional arrangements short of one branch virtually 'usurp[ing]' from another its constitutionally defined function." *State v. Nelson*, 170 Vt. 125, 128, 742 A.2d 1248, 1250 (1999) (quoting *In re D.L.*, 164 Vt. at 229, 669 A.2d at 1176); see also *North Dakota Council of School Adm'rs v. Sinner*, 458 N.W.2d 280, 285 (N.D. 1990) (adopting "more relaxed" application of separation-of-powers doctrine to allow delegation in broad and general terms in a complex area).

¶ 22. Although they have not phrased them this way, plaintiffs have actually made two related separation-of-powers arguments here: (1) empowering the Secretary of Administration to cut spending below appropriated amounts is an unconstitutional encroachment on the legislative branch's power of appropriation; and (2) delegating power to the JFC to approve the spending reductions is an improper delega-

tion of a decision that can be made only by the full Legislature.[5] We consider the arguments in this order.

¶ 23. Plaintiffs' first argument is largely premised on the fact that both appropriation and spending are legislative powers. As our foregoing discussion reflects, appropriation is a legislative power, but spending is an executive power. Rather than dealing with one branch's clear encroachment on another's core function, we are instead dealing here with the area in which the powers of the branches overlap.

¶ 24. The need for the legislation before us is clear and compelling. The Legislature is ordinarily in session for only part of the year. It adopts appropriations acts based on a projection of the revenues that will be available. Projecting revenues is hardly an exact science. Indeed, many of the revenue sources are volatile, largely in response to economic cycles. A revenue estimate that is accurate at one point in time can turn out to be very inaccurate because of unforeseen circumstances. A deficit may make a slowing of spending unavoidable. The deficit will affect the fiscal health of the state and the ability to borrow needed funds, and its cost. In short, this is a case that involves the "practical realities" that we recognized in *In re D.L.*, and these realities have been reflected in some form of delegation statute, at least since 1960. If it also involved core and exclusive functions of a branch of government, we would be required to enforce the constitutional command despite those realities. See *Vill. of Waterbury v. Melendy*, 109 Vt. 441, 450, 199 A. 236, 240 (1938) (concluding that a "delegation of authority must not encroach upon the strictly legislative functions of the legislature"). Where it instead involves shared powers at the intersection of the branches of government, we find no constitutional violation.

¶ 25. In reaching this decision, we have consulted the decisions from other states and find that they almost uniformly support the conclusion

---

[5] Interspersed with plaintiffs' separation-of-powers arguments are references to the spending decisionmakers — the Secretary of Administration and the JFC — as unaccountable to the citizens of Vermont, and the legislation as offensive to "the democratic process." We do not read these comments as making a separate and different legal argument. In any event, we would reject it. The authorization and direction we are considering was enacted as legislation by the full Legislature. The Secretary of Administration is a direct appointee of the Governor who acts at the Governor's direction. The JFC members are all elected legislators. However we might construct the legal principles that plaintiffs invoke, we cannot see how the circumstances before us would violate those principles.

that we reach. In *University of Connecticut Chapter AAUP v. Governor*, 512 A.2d 152, 159 (Conn. 1986), for example, the Supreme Court of Connecticut upheld legislation authorizing the Governor to reduce budgetary allotments by up to five percent when, due to decreases in anticipated state revenues, it was necessary to prevent a deficit. The court held that such authority did "not delegate a strictly legislative function," did "not delegate the legislative authority to appropriate" and was not inconsistent with the executive's traditional control over budgetary expenditures. *Id.* at 158. Similarly, in *New England Division of American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248 (Mass. 2002), the plaintiffs challenged the constitutionality of a statute under which the executive branch, in response to revenue shortfalls, reduced allotments for expenditures on certain specific appropriations in the legislature's general appropriations act. The court rejected the challenge, noting that the statute comported with the general principle that the "spending [of] money is essentially an executive task," *id.* at 1256, reflected a pragmatic recognition of the executive's superior ability to make "necessary reductions . . . on an expedited basis," *id.* at 1257, and represented the legislature's considered judgment "that the Commonwealth's need to remain solvent overrides particular statements of social policy contained in those appropriat[ed] items." *Id.* The court also stressed that the potential for executive abuse was limited because the statute authorized such reductions only "in a time of true financial emergency," and restricted reductions to an "amount equal to such [revenue] deficiency." *Id.* Other decisions respond similarly to the argument that the executive has encroached on the power of the legislature. See *Opinion of the Justices*, 2004 WL 693431, at *3 (stating that legislature may grant governor discretion on how to spend appropriated funds); *State v. Fairbanks N. Star Borough*, 736 P.2d 1140, 1142 (Alaska 1987) (explaining that legislature can delegate to executive branch the discretion to spend or not spend appropriated funds as long as there are standards for the exercise of discretion); *Chiles v. Children A,B,C,D,E, & F*, 589 So. 2d 260, 268 (Fla. 1991) (observing that legislature can delegate power to executive to reduce spending in case of a budget crisis as long as there are adequate standards); *Legislative Research Comm'n v. Brown*, 664 S.W.2d 907, 926 (Ky. 1984) (concluding that legislature can delegate to executive power to cut budgets to avoid a deficit); *North Dakota Council of School Adm'rs*, 458 N.W.2d at 286 (explaining that statute allowing state Office of Management and Budget Director to reduce budgets

uniformly in response to predicted deficit grants "only the authority to execute the law within the parameters established by the Legislature" and is not unconstitutional delegation of legislative power to executive branch). But see *County of Cook v. Ogilvie*, 280 N.E.2d 224, 227 (Ill. 1972) (holding that legislature cannot delegate to the governor power to transfer funds from one appropriations account to another).

¶ 26. Plaintiffs argue, however, that even an otherwise valid legislative delegation cannot be made without limiting standards for the exercise of discretion and no standards exist here. The Secretary's authority to implement a deficit reduction plan under § 324 is limited in the following respects: (1) the official revenue estimate for the general, transportation or federal fund must have declined by 2% or more from that in effect on January 15, 2002; (2) the Legislature must not be in session; (3) the plan must be necessary to ensure a balanced budget in the general or transportation funds; (4) the plan must be "designed to minimize any negative effects on the delivery of services and on local budgets, including the delivery of tobacco fund supported youth substance abuse education and prevention services"; and (5) the plan must "reflect the priorities established by the general assembly in the fiscal year 2003 appropriations act."[6] 2001, No. 142 (Adj. Sess.), § 324. We agree with plaintiffs that any delegation must be in accordance with appropriate standards. Thus, the issue is whether the above limits provide the needed standards.

¶ 27. The purpose of standards is to avoid delegation of the law-making function. Thus, "[a] distinction is consequently drawn between a delegation of the power to make the law which necessarily includes a discretion as to what it shall be and the conferring of authority or discretion as to its execution." *Melendy*, 109 Vt. at 451, 199 A. at 240. The discretion conferred can be "wide . . . in the manner and method for the execution of statutes validly adopted." *Vermont Educ. Bldgs. Fin. Agency v. Mann*, 127 Vt. 262, 267, 247 A.2d 68, 72 (1968). Although the purpose of the agency in *Mann* was to issue revenue bonds to finance construction projects for higher education institu-

---

[6] There are also limitations applicable to possible specific elements of the plan. For example, the plan could include transfers of funds from certain reserve funds as long as they were left at a specified level. Transfers from the tobacco settlement fund have to be used for grants or services to benefit clients of the Agency of Human Services. Reductions cannot be made in funds "to fulfill the state's debt obligations" or for "salaries of elected officers of the executive department." 32 V.S.A. § 704(e)(1), (3).

tions, and the agency had the discretion to determine which projects to support, the Court held that the power conferred did not include the power to appropriate public funds. *Id.* at 268, 247 A.2d at 72. Instead, the power delegated was "to enter contracts to achieve a valid public objective" and such power "of necessity, involves a wide discretion on the part of the Agency." *Id.* Because the authority was "confined within ascertainable and reasonable boundaries," the Court found there were "sufficient and adequate standards to guide and direct the action of the board within the dimensions of constitutional requirements." *Id.* Indeed, we have found the delegation standards inadequate only in *Melendy* where we found no standards at all. 109 Vt. at 453, 199 A. at 241.

¶ 28. The overriding difference between deficit-prevention schemes of the type before us that have been upheld, and those that have been struck down, lies in whether there are any standards for the exercise of implementation discretion. Thus, in *Chiles*, the Florida Supreme Court found that the Legislature's responsibility was "totally abandoned" because "the power to reduce, nullify, or change [the Legislature's] priorities is given over to the total discretion of another branch of government." 589 So. 2d at 265. In striking down the statutory scheme, the court explained:

> This is not to say that the legislature cannot permit another branch or agency to respond to a budget crisis caused by unexpected events between legislative sessions. The legislature can delegate functions so long as there are sufficient guidelines to assure that the legislative intent is clearly established and can be directly followed in the event of a budget shortfall. Carefully crafted legislation establishing, among other things, the extent to which appropriations may be reduced, coupled with a recitation of reduction priorities and provisions for legislative oversight, might pass facial constitutional muster.

*Id.* at 268. Similarly, in *Fairbanks North Star Borough*, the Alaska Supreme Court struck down the delegation because the "legislature ha[d] articulated no principles, intelligible or otherwise, to guide the executive" so that the Governor could make any cut in any program for any purpose. 736 P.2d at 1143.

¶ 29. The closest example of standards held adequate for a delegation of legislative powers over fiscal matters is *State ex rel. Schneider v. Bennett*, 564 P.2d 1281 (Kan. 1977). That case considered the

constitutionality of the delegation of certain spending powers to a committee made up of legislators, a delegation that had earlier been struck down for lack of standards in *State ex rel. Schneider v. Bennett*, 547 P.2d 786 (Kan. 1976). After the court's earlier decision, the legislature continued the powers in the committee and added the following standards: (1) the requested action must not have been rejected in the last legislative session, (2) it must not be contrary to known legislative policy, (3) it must assist the state agency in attaining an objective or goal that bears a valid relationship to its powers and functions, and (4) it must involve an unforeseeable occurrence or unascertainable effects of a foreseeable occurrence that characterizes the need for it, and waiting for the next legislative session would not accomplish (3) above. *Id.* at 1286. Noting that standards must "canalize" the delegated power so that "the exercise of the delegated power must be restrained by banks in a definitely defined channel," the court held that the standards met that requirement and upheld the delegation. *Id.* at 1289.

¶ 30. The Connecticut Supreme Court upheld even less specific standards in *University of Connecticut Chapter AAUP*, 512 A.2d at 159. There, the governor could make reductions in allotments if "due to a change in circumstances since the budget was adopted," reductions should be made; estimated budget resources will be insufficient to pay all appropriations in full; reductions are made to the extent that the governor deems necessary; and the reduction is limited to no more than 3% in any fund and 5% in any appropriation account. *Id.* at 158-59. The court held these standards to be sufficient because they were as definite as was reasonably practicable under the circumstances. *Id.* at 159.

¶ 31. We begin with an assumption that the legislation is constitutional. *Benning v. State*, 161 Vt. 472, 481, 641 A.2d 757, 762 (1994). We hold that, under our precedents and those from other courts, the standards § 324 imposes are sufficient for the exercise of the powers of the Secretary and the JFC. They are exactly the kind of standards suggested in *Chiles* and upheld in *Schneider*. We agree with the Connecticut court that the standards must be tailored to the circumstances. It would be difficult here to create more detailed, narrow or explicit standards. Indeed, flexibility is required to implement reductions in a way that minimizes the harm to the public generally and the beneficiaries of state programs.

¶ 32. Plaintiffs' second argument is that the Legislature cannot delegate its power over appropriation to the JFC, the designated decisionmaker under the statute. For this argument, plaintiffs invoke the Chapter II, § 2 requirement that "the Supreme Legislative power shall be exercised by a Senate and a House of Representatives" as well as the separation-of-powers requirement. Plaintiffs argue that legislative powers cannot be exercised by a committee of legislators on behalf of the House and Senate.

¶ 33. We have never directly addressed whether the Legislature can delegate powers to committees that are made up of legislators and are part of the legislative branch of government. At least impliedly, we upheld the validity of such a delegation in *State Highway Board v. Gates*, although the defendant in that case did not rely particularly on the fact that the emergency board was composed primarily of legislators. 110 Vt. at 73, 1 A.2d at 828. As in that case, we are talking here about actions that invoke the constitutional responsibilities of both the executive and legislative branches. Although plaintiffs argue otherwise, we are not addressing a situation where the Legislature is trying to delegate one of its unique powers to one of its committees. For this reason, we do not find a violation of § 2.

■ ¶ 34. Other courts have upheld the involvement of a committee of the legislature in similar financial management decisions, see, e.g., *Bennett*, 564 P.2d at 1288, and the Florida Supreme Court in *Chiles*, 589 So. 2d at 268, suggested that legislative involvement in this fashion may be a constitutional necessity. If we are to be tolerant of "overlapping institutional arrangements" where one branch is not virtually usurping the function of another, see *State v. Nelson*, 170 Vt. at 128, 742 A.2d at 1250, we believe we must uphold the decision-making power of the JFC in the statutory scheme before us. It enables the Legislature to delegate needed responsibilities to meet fiscal emergencies when it is not in session without ceding total control to the executive branch. As we held above, the delegation contains sufficient standards to ensure that the spending priorities of the full Legislature are respected. In short, the practical realities of effective governance strongly support the JFC's role in creating a deficit-prevention plan and outweigh any commingling of functions that might be seen as inconsistent with the principle of separation of powers.

## II.

¶ 35. We turn next to the trial court's ruling that, although the deficit-prevention section of the Act was constitutionally valid, PATH

nevertheless provided inadequate notice and opportunity for comment prior to its adoption of an emergency rule implementing the planned budgetary reductions. On this issue, plaintiffs contend that the court abused its discretion by staying the issuance of a preliminary injunction despite its finding that the emergency rule was procedurally invalid and by allowing PATH to correct the deficiency. PATH responds that it properly dispensed with additional notice and hearings under its statutory authority and the circumstances presented, and that even if it did not, the court correctly declined to enjoin immediate implementation of the emergency rule under its broad equitable authority.

¶ 36. An understanding of the competing claims requires a careful review of the steps leading up to the adoption of the emergency rule. As noted above, the Secretary filed a deficit-prevention plan with the JFC on August 12, 2002. The JFC met and reviewed the plan on August 12, 15, and 23, and voted to adopt the plan on August 23. That same week, the plan was presented to the Medicaid Advisory Board, comprised of Medicaid consumers, providers, and advocates. On August 26, Agency of Human Services Secretary Kitchel and PATH Commissioner Elliott met with the Health Access Oversight Committee of the Legislature to review the proposed reductions to the Agency's budget. See 1995, No. 14, § 13(a) (creating a health access oversight committee of ten legislators "to monitor the development, implementation, and ongoing operation of the health access program"). The oversight committee addressed each of the proposed reductions at issue here, focusing particularly on the elimination of coverage for elective inpatient surgery under VHAP. Secretary Kitchel informed the committee that the Medicaid Advisory Board had also inquired about this particular reduction, answered questions about its anticipated impact on VHAP beneficiaries and providers in a number of hypothetical circumstances, and underscored the fiscal constraints driving the proposal.

¶ 37. On September 3, one week after the oversight committee hearing, PATH published a notice of emergency rulemaking in the Burlington Free Press, a newspaper with statewide circulation. The notice outlined the changes to VHAP and Medicaid coverage of adult chiropractic, elective-surgery, and denture services effective October 1, and explained that although comments would not be received in connection with the emergency rule, the public would be afforded an opportunity to comment on an identical nonemergency rule to be filed

on the same date. Two days later, on September 5, PATH filed with the Secretary of State and the Legislative Committee on Administrative Rules (LCAR) both the emergency rule and an identical nonemergency rule subject to the normal rulemaking procedures. See 3 V.S.A. § 844(c) (requiring emergency rules to be filed with the Secretary of State and LCAR).

¶ 38. The emergency rule was accompanied by a "Statement of Emergency" prepared by Secretary Kitchel, as required by statute. *Id.* § 844(d)(2) (requiring emergency rules to include a "statement by the adopting authority explaining the nature of the imminent peril to the public health, safety or welfare"). In her statement, Secretary Kitchel explained that the coverage to be eliminated had been "selected, after careful analysis, to avoid reductions in services required by the most needy Vermonters," that the benefits cuts, while "unfortunate, achieve the necessary savings 'most conducive to the public weal,'" and that "emergency rulemaking is essential by October 1, 2002 in order to avert irretrievable economic loss, ensure the overall integrity of the health care programs, and maintain the well being of the public at-large." (quoting Vt. Const. ch. I, art. 7.)

¶ 39. On September 25, LCAR conducted a public hearing to consider the emergency rule. See 3 V.S.A. § 842(a) (outlining that committee may object to rule within thirty days it is first placed on committee's agenda but no later than forty-five days after filing of final proposal); § 844(e) (allowing committee objection to emergency rule, on majority vote, on grounds that it is beyond authority of agency, contrary to intent of Legislature, arbitrary, or not necessitated by imminent peril sufficient to justify adoption of emergency rule). Members of the public, including plaintiffs' representatives, commented on the emergency rule. After a series of votes, the committee neither approved nor objected to the rule, and it eventually went into effect on November 1. The one month delay in the effective date occurred when, after the LCAR hearing, PATH realized that the savings anticipated by the deficit-prevention plan were based on the later date.

¶ 40. An agency is statutorily authorized to adopt an emergency rule when it "believes that there exists an imminent peril to public health, safety or welfare." *Id.* § 844(a). An emergency rule may be "adopted after whatever notice and hearing that the agency finds to be practicable under the circumstances." *Id.* Although plaintiffs argued below that the emergency rule PATH promulgated was not necessitated by a genuine "imminent peril" to the public welfare, the superior

court concluded otherwise, finding that Secretary Kitchel "had a valid basis to invoke emergency rulemaking" to achieve the projected savings, preserve existing health care programs, and avoid a fiscal crisis. Plaintiffs have not challenged this conclusion on appeal. They do, however, contend the court erred by declining to enjoin implementation of the rule notwithstanding its further conclusion that PATH violated the statute by failing "to provide persons affected with as much notice and hearing for public input as was practicable under the circumstances."

¶ 41. Although the court referred to inadequate "notice," we take that reference as applying to notice of the availability of public participation in the rulemaking process, not notice of the emergency rule. Indeed, PATH gave almost a month's notice of the rule, which turned into two months when its implementation was delayed. There was no challenge that PATH failed to comply with the mandate of the statute to "ensure that emergency rules are known to persons who may be affected by them." *Id.* § 844(a). Because the health care coverage at issue was largely elective, the notice may have allowed some recipients to obtain needed care before the new rule went into effect.[7]

¶ 42. The court's conclusion that PATH failed to provide adequate notice and hearing was based on two predicate determinations. First, it found that even in the case of a legitimate and imminent peril requiring emergency rulemaking, an agency is required under the statute to provide the maximum notice and hearing practicable under the circumstances. Second, the court rejected the claim that the extent of the notice and hearing to be provided was "entirely within the discretion of the agency." Applying these principles, the court found that PATH knew as of August 23 — the day the JFC approved the

---

[7] Two of the plaintiffs addressed the question of obtaining care before the rule went into effect in affidavits to show irreparable harm. Susann Hunter said that she first learned that VHAP elective surgery would be eliminated on October 11, 2002, too late to schedule needed hip replacement surgery. Jane Doe stated that she needed an adjustment in her lower denture but could not get to her dentist for that purpose until after November 1, 2002. By affidavit of Paul Wallace-Brodeur, Director of the Office of Vermont Health Access within PATH, defendants suggested alternative ways that these two plaintiffs might obtain at least partial benefits to cover their needs, and as to the third plaintiff, suggested that the delay in implementation had made it possible for him to receive all benefits under the prior policy. None of these factual questions were resolved by the trial court.

plan — of the need to proceed with emergency rulemaking. Further, the court found that this left more than a month — measured to the planned implementation date of October 1 — to schedule and hold a public hearing, and that the record did not, therefore, support Secretary Kitchel's decision that a public hearing was impracticable under the circumstances.

¶ 43. We find no fault with the court's conclusion that an agency adopting an emergency rule should strive to provide as much notice and opportunity for public input as is "practicable under the circumstances." *Id.* This is clearly consistent with the legislative purpose of the public comment period. See, e.g., *Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877, 881 (3d Cir. 1982) ("[T]he public interest is served by a careful and open review of proposed administrative rules and regulations."); *In re Dep't of Pub. Serv.*, 161 Vt. 97, 100, 632 A.2d 1373, 1375 (1993) (noting that "'[i]nformed changes and distinctions are the very *raison d'etre* of the notice-and-comment period'") (quoting *Rybachek v. Envtl. Prot. Agency*, 904 F.2d 1276, 1288 (9th Cir. 1990)); *Salmon Brook Convalescent Home, Inc. v. Comm'n on Hosps. & Health Care*, 417 A.2d 358, 364 (Conn. 1979) (observing that one purpose of notice-and-comment period is to enable agency promulgating rule to educate itself before establishing regulations that substantially affect public).

¶ 44. Although, as discussed below, we disagree with the standard of review that the superior court employed, we agree that the decision to adopt the emergency rule without any hearing or opportunity for public comment was reviewable. As we have noted in the past, the Vermont Administrative Procedure Act is derived, in part, from the Revised 1961 Model State Administrative Procedure Act. See Unif. Adm. Proc., 15 U.L.A. 174, 182 (2000); *Barnet Hydro Co. v. Pub. Serv. Bd.*, 174 Vt. 464, 466, 807 A.2d 347, 349 (2002) (mem.). The authorization for emergency rulemaking found in 3 V.S.A. § 844(a) is taken in part from § 3(b) of the Model Act, but the language on notice and hearing for emergency rules differs somewhat. The Model Act states that for emergency rules the agency "may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable." Unif. Adm. Proc. § 3(b), 15 U.L.A. 213 (2000). The wording of the Model Act suggests that the agency has unlimited discretion to decide whether any prior notice and hearing will be available.

¶ 45. Although the difference in language is not great, the Vermont statutory language is inconsistent with an interpretation that

gives total discretion to the agency and prevents judicial oversight. The statute allows an emergency rule to be adopted "after whatever notice and hearing that the agency finds to be practicable under the circumstances." 3 V.S.A. § 844(a). Courts have generally found that administrative determinations concerning whether the standards for emergency rulemaking were met are reviewable, although these standards are typically phrased in subjective terms. See *Melton v. Rowe*, 619 A.2d 483, 485 (Conn. Super. Ct. 1992) (collecting cases). Our statute provides that the "court may fashion appropriate relief" for procedural violations of a rulemaking process. 3 V.S.A. § 846(c). We conclude that we can review an agency decision that notice and hearing is not practicable under the circumstances.

¶ 46. We do not, however, believe that a court is free to substitute its judgment as to what is "practicable under the circumstances" for that of the agency. Courts generally presume that an agency's action is valid, *Vt. Ass'n of Realtors v. State*, 156 Vt. 525, 530, 593 A.2d 462, 465 (1991), and will defer to the agency's judgment in applying a statute that it is charged to execute, *Lemieux v. Tri-State Lotto Comm'n*, 164 Vt. 110, 112-13, 666 A.2d 1170, 1172 (1995). Thus, in the context of emergency rulemaking, courts have held that an agency's initial decision to adopt an emergency rule is subject to an abuse of discretion standard. See, e.g., *Philadelphia Citizens in Action*, 669 F.2d at 886 (upholding agency's decision that standards for emergency rulemaking are met unless arbitrary, capricious or abuse of discretion); *Doe v. Wilson*, 67 Cal. Rptr. 2d 187, 194 (Ct. App. 1997) ("[A] court is not necessarily bound by an agency's determination of the existence of an emergency, but the court must accord *substantial deference* to this agency finding, and may only overturn such an emergency finding if it constitutes an abuse of discretion by the agency."); *Berrios v. Dep't of Pub. Welfare*, 583 N.E.2d 856, 861 (Mass. 1992) (holding that Department of Public Welfare decision to adopt emergency regulations eliminating certain benefits was entitled to "every presumption in its favor and is not subject to question in judicial proceedings unless palpably wrong") (internal citation omitted); *Delaware Bay Waterman's Ass'n v. New Jersey Dep't of Envtl. Prot.*, 697 A.2d 957, 960 (N.J. Super. Ct. App. Div. 1997) (agency decision that emergency exists for rulemaking must be upheld unless arbitrary, capricious, unreasonable or not supported by substantial credible evidence in the record as a whole). Once it has invoked its

emergency rulemaking authority, an agency's subsequent decision concerning the extent of notice and hearing to be provided has similarly been held to be "entitled to considerable deference by a reviewing court." *Philadelphia Citizens in Action*, 669 F.2d at 886 (upholding Department of Health and Human Services' decision that comment period prior to enactment of emergency regulations was "impracticable" under federal rule); see also *Petry v. Block*, 737 F.2d 1193, 1201-02 (D.C. Cir. 1984) (In light of "extremely limited time given by Congress" for agency to adopt emergency regulation reducing expenditures, court cannot find that agency decision to dispense with normal comment period "was unreasonable.").

¶ 47. In light of these standards, we are unable to conclude that PATH abused its discretion in determining that a public hearing on the emergency rule was impracticable under the circumstances. Four main reasons cause us to differ with the superior court in this regard.

¶ 48. First, PATH was operating under exacting time constraints. The JFC approved the deficit-prevention plan on August 23, 2002, and it was the understanding of defendants Kitchel and Elliott that the reductions requiring a rule change had to become effective on October 1 to achieve the needed savings.[8] Thus, PATH had about thirty-eight days to present the specific VHAP and Medicaid reductions to the Health Access Oversight Committee, draft and file an emergency rule implementing the changes, notify and appear before LCAR, and notify recipients, providers and PATH staff of the new rules and how they would work. The record shows that defendants moved with dispatch, presenting the proposed health care reductions to the Health Access Oversight Committee on August 26, the Monday following the vote of the JFC, filing the emergency rule with the Secretary of State and the Rules Committee on September 5 of the following week, and scheduling a meeting with Rules Committee — while the Legislature was *out* of session — within three weeks thereafter, on September 25, less than one week before the emergency rule was to take effect.

---

[8] We do not believe that the mistake in determining when the emergency rule had to be effective changes our decision. In hindsight, if defendants knew that they had almost two months to make the program reductions effective, they could have done so through normal, or near normal, procedures. However, they determined in good faith that they had additional time only after they had gone through the emergency rulemaking procedure. Thus, they would have faced similar constraints in scheduling a comment period and public hearing before the deadline.

¶ 49. The trial court found that, despite these constraints, PATH should have held a public hearing prior to the Rules Committee meeting on September 25, in order to receive and incorporate comments from program beneficiaries. Even a minimal two-week notice-and-comment period, however, would not have permitted such a hearing before September 19, two weeks from September 5, when the rule was filed with the Committee. This would have left less than one week for PATH to incorporate any changes that resulted from the hearing and comments, submit a final proposal to the staff or chair of the Rules Committee, and distribute it to the members before the September 25 hearing. It is conceivable that all of this could have been accomplished within the time available, but it is also quite possible that the attempt would have resulted in delays that could have jeopardized a timely implementation of the rule, contributing to the state's deteriorating financial situation and undermining the very purpose of the expedited procedure. As one court in similar circumstances aptly observed: "The Secretary is not to be held to a standard of perfection, but merely to a standard of good faith." *Robinson v. Sec'y of Admin.*, 425 N.E.2d 772, 778 (Mass. App. Ct. 1981) (upholding agency's decision that adoption of emergency regulation without notice and hearing was necessary to avoid irretrievable loss of state revenue).

¶ 50. Second, although we find the decision not to go forward with a hearing-and-comment period reviewable, we also find our review role to be very limited. The primary protection of public participation lies in the narrow standard for allowing emergency rulemaking, that there exists "an imminent peril to public health, safety or welfare." 3 V.S.A. § 844(a). The primacy of this protection is demonstrated by the absence of a role for LCAR in reviewing the opportunity for public input on emergency rules. Thus, although LCAR may object to a regular rule because the "agency did not adhere to the strategy for maximizing public input prescribed by the interagency committee on administrative rules," *id.* § 842(b)(4), there is no similar ground for objecting to an emergency rule, *id.* § 844(e). The only comparable ground is that invocation of emergency procedures is "not necessitated by an imminent peril to public health, safety or welfare." *Id.* § 844(e)(4).

¶ 51. The superior court found that the standard for emergency rulemaking was met, a decision not appealed. The statute assumes that if the standard for emergency rulemaking is met, a reduction in public participation will necessarily occur. Moreover, because emergency

rules are of only limited duration — not more that 120 days, *id.* § 844(b) — public participation will often be available in connection with a permanent rule. Thus, the record in this case shows that PATH proposed a permanent, identical rule to take effect after the expiration of the emergency rule and held a public hearing on November 12, 2002. The wording of the statute clearly grants broad discretion to the agency to define the nature and extent of public participation in emergency rulemaking, if any. Only in cases of very clear error should we intervene in an agency's decision determining the level of that public participation.

¶ 52. Third, there were other opportunities for public participation in shaping the policy implemented by the emergency rule. The critical decision to eliminate the VHAP and Medicaid coverage in the deficit-prevention plan was made by the JFC, a body of legislators who routinely must respond to constituent comments. State officials took the plan to the advisory body that represents consumers and providers, and to the legislative committee with jurisdiction over health access issues.

¶ 53. Fourth, PATH had very little discretion in fashioning its rule. It had no discretion to determine whether to cut the Medicaid and VHAP coverage elements specified in the deficit-prevention plan; that decision had been made by the JFC. We recognize that issues could arise in determining how to implement the policy decision of the Secretary of Administration and the JFC. We consider this factor only because it narrowed the extent to which public participation could be meaningful and effective.

¶ 54. There is no question, on the record before us, that defendants' decision to forego a formal public comment period was exercised reasonably and in good faith in light of the statutory imperative to identify budgetary reductions under the deficit-prevention plan, and the pressing and inflexible time constraints on PATH. Accordingly, we cannot conclude that the process utilized by defendants for the adoption of the emergency rule in this case was an abuse of discretion. That portion of the judgment holding to the contrary must, therefore, be reversed.[9]

---

[9] In light of our holding, we need not address PATH's alternative claims that the court acted within its broad equitable discretion in declining to enjoin implementation of the emergency rule, and that plaintiffs' appeal was rendered moot when the emergency rule expired after 120 days and the permanent rule went into effect. But cf. *Doe*, 67 Cal. Rptr. 2d at 193 (holding that challenge to emergency rule is not rendered moot because validity

*That portion of the superior court decision invalidating the emergency rule as violative of the requirements of the Administrative Procedure Act is reversed. In all other respects, the judgment is affirmed.*

---

of rule is matter of public importance and may evade normal appellate review by reasons of replacement by permanent rule); *Ind. Family & Soc. Servs. Admin. v. Amhealth (Evansville), Inc.*, 790 N.E.2d 162, 165 (Ind. Ct. App. 2003) (concluding that although emergency rule was replaced with duly promulgated permanent rule, challenge to its validity was not moot where plaintiffs might be entitled to Medicaid reimbursements denied while emergency rule was in effect); *Mauzy v. Gibbs*, 723 P.2d 458, 461 (Wash. Ct. App. 1986) (declining to dismiss as moot a challenge to emergency rule superseded by permanent rule because case raised issues of first impression that might recur).

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.